492 So.2d 862 (1986)
STATE of Louisiana
v.
Jeffrey C. CLARK.
No. 85-KA-1708.
Supreme Court of Louisiana.
June 23, 1986.
Rehearing Denied September 4, 1986.
*863 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Bryan Bush, Dist. Atty., Premila Burns, Kay Kirkpatrick, Dennis Weber, Asst. Dist. Attys., for State.
Keith Nordyke, June E. Denlinger, Nordyke & Denlinger, Baton Rouge, for defendant-appellant.
DIXON, Chief Justice.
Jeffrey Cameron Clark was indicted, tried and convicted for the first degree murder of Andrew H. Cheswick. After finding that the murder was committed during the course of an armed robbery and in an especially cruel, heinous or atrocious manner, C.Cr.P. 905.4, the jury recommended that Clark be sentenced to death. In an original and two supplemental briefs he attacks the conviction and death sentence, raising sixty-six assignments of error. We affirm the conviction. Because the prosecutor strayed beyond the bounds of proper argument in the sentencing phase, the sentence must be set aside and the case remanded for further proceedings.
The facts establish that on October 18, 1984 at 10:00 a.m. the victim was verifying cash register tapes and preparing bank deposit forms at Studebakers Lounge in Baton Rouge, his place of employment. At that time two telephone sales representatives called on the lounge and were shown by Clark to Cheswick's office. Two other sales personnel were the only other persons *864 in the lounge. All four sales representatives departed soon afterward, and Clark remained behind.
At 11:00 a.m. a Wells Fargo guard arrived to pick up the receipts and discovered Cheswick dead of three gunshots to the head. The victim had a pen in his hand and the adding machine was still running. There were no indications of a struggle. The police were summoned and found three .25 caliber casings on the floor. The office safe and cash drawers had been emptied; it was subsequently determined that in excess of $2600.00 had been taken.
From descriptions supplied by the sales representatives and information supplied by Studebakers' manager, the police were able to determine Clark's identity. Once a material witness warrant had been obtained and the search for Clark had begun, he turned himself in.
Clark was advised of his rights, which he acknowledged and waived in writing. He next handed to the police two deposit slips, totaling $2635.50 and bearing the date of the murder, which he claimed represented his own business receipts. He also gave the police a four page written account of his activities on that date in which he admitted his presence at Studebakers Lounge that morning. He consented to a search of his home, which turned up numerous dishonored checks drawn on his business account, bank records indicating overdraft status of several months standing, and a pistol. A search of his car revealed a ski mask and a pair of gloves. When it was determined that Clark's business had not generated sufficient sales to account for the deposits he was arrested on suspicion of murder.
Clark was again advised of his rights. He asked to speak privately with his girlfriend and his father. When his request for privacy was denied he proceeded to speak with each of them in the presence of police officers. To the girlfriend he stated, "... I did it ..." and to his father he said, "... I am ninety-nine percent sure they got me."
While in custody Clark approached several inmates in attempts to thwart his conviction. He offered Michael Hood $5000.00 to have a gun bored out and disclosed its location. Hood feigned cooperation but instead informed the police, who retrieved the gun and established it was the murder weapon. He likewise offered Victor Bell $5000.00 to relate the facts and circumstances of the crime to the police but testify differently at trial. Bell also pretended to cooperate, but at trial disclosed precisely what Clark had told him:
"He said he went to Studebakers that morning. They had several people there.... Eventually everybody left but him. Mr. Cheswick was sitting in his office in the back counting the money and, you know, credit card vouchers and stuff. He walked up behind Mr. Cheswick and shot him once in the back of the head. The man fell out of his chair, broke the chair. He bent over and shot him two more times in the head. He gathered up the money in the money sack and left ...
He went to his momma's to clean up and everything and went to the bank that morning and deposited $1780.00 in the bank. He went back to the bank that evening and deposited $850.00 in the bank. He said the only mistake he made was taking the bank bag with him."

Assignment of Error No. 1; Supplemental Assignments Nos. 1-9
In these assignments Clark argues that the hearsay statements of Michael Hood should not have been admitted at the hearing on his motion to suppress; that Hood's testimony constitutes "other crimes evidence" within the meaning of C.Cr.P. 720 and should not have been allowed at trial or discussed in opening and closing arguments; and that Bell's testimony and any evidence of the returned checks or the status of his bank account should have been excluded for the same reason. He also argues that neither Hood nor Bell should have been permitted to testify that they were afraid of him. He claims further that *865 he had no Prieur notice of the state's intent to introduce any of this evidence.
The first of these assignments is directed to testimony given by the investigating officer who stated that Hood contacted him, and that as a result of his conversation with Hood he searched for and found the murder weapon in a storm drain. This testimony is not hearsay, see State v. Ford, 489 So.2d 1250, 1261 (La. 1986); State v. Watson, 449 So.2d 1321, 1328 (La.1984), cert. denied 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985), and is admissible.
Assuming with some doubt that either Hood's testimony or evidence of an overdrawn bank account and possession of checks drawn on insufficient funds revealed Clark's involvement in other crimes, the former evidence was plainly relevant and admissible as an admission by conduct, State v. Graves, 301 So.2d 864 (La.1974), cf. State v. Burnette, 353 So.2d 989 (La. 1978), while the latter was properly introduced to establish motive. State v. Lafleur, 398 So.2d 1074 (La.1981). The evidence also meets the jurisprudential rule that it be both convincing and more probative than prejudicial. See id., at 1080. Hood's account proved reliable when the gun was found where he said Clark told him it was hidden. It is not disputed, on the other hand, that Clark wrote the checks in question and is responsible for the balance of his bank account. The risk of prejudice in showing a negative bank balance and dishonored checks to the jury is obviously slight, while this evidence is highly probative. And while Clark's attempt to have the murder weapon altered is considerably more prejudicial, we hold its probative value outweighed whatever prejudice was caused. Admission of this evidence was not error.
Assuming further that Bell's testimony put before the jury evidence of Clark's participation in a conspiracy to commit perjury, see R.S. 14:26; 14:123, such evidence is also relevant and admissible. State v. Graves, supra. It too was consistent in many respects with the state's investigation of the murder, and is more probative than prejudicial.
The state suggests that Clark may not now raise the Prieur issue because he failed to raise this objection at trial. C.Cr.P. 841. It is true this procedural requirement is strictly applied. E.g., State v. Kahey, 436 So.2d 475, 489 (La.1983) (second degree murder). It is also the policy of this court in capital cases to consider arguments which should have been raised in the trial court, but were not. State v. Glass, 455 So.2d 659 (La.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 2159, 85 L.Ed.2d 514, rehearing denied ___ U.S. ___, 105 S.Ct. 3516, 87 L.Ed.2d 645 (1985). We therefore do not agree that Clark's failure to object precludes our consideration of the question; yet neither should a defendant, with knowledge of the state's intention to introduce such evidence and with an opportunity to prepare his defense, be permitted to withhold his objection at trial, take his chances with the jury, and assign error in this court when his gamble fails. The record shows that Clark received written notice in response to discovery requests of the state's intent to introduce the inmates' testimony and the evidence of Clark's financial data. Under these circumstances, Clark cannot complain of lack of notice or a lack of opportunity to prepare his defense, and is not entitled to a mistrial on this basis.
The record further shows that neither Hood nor Bell testified of threats made by defendant. Hood testified rather that he feared "certain people in the courtroom," while Bell said only that he was fearful of other inmates. The state gave no indication in argument that Clark had threatened these witnesses, but suggested only that they had testified against their interests, in an effort to enhance their credibility. This is not other crimes evidence, and C.Cr.P. 720 does not apply.

Assignments of Error Nos. 2 and 3
Clark argues that he was arrested without probable cause, that he did not knowingly and intelligently waive his right to counsel following his arrest, and that all *866 statements given by him and all evidence seized thereafter should have been suppressed. The trial judge correctly rejected each argument.
It was not necessary to show probable cause to believe that Clark killed Cheswick in order to obtain the material witness warrant. R.S. 15:257 provides:
"Whenever it shall appear, upon motion of the district attorney or upon motion of a defendant supported by his affidavit, that the testimony of any witness is essential to the prosecution or the defense, as the case may be, and that there are good grounds to fear that said witness may depart or be taken from the jurisdiction of the court, a judge, as defined in Article 931 of the Code of Criminal Procedure, shall issue a warrant for the arrest of the witness. The witness shall be arrested and held in the parish jail, or such other suitable place as shall be designated by the court, until he gives an appearance bond as provided for defendants when admitted to bail, or until his testimony shall have been given in the cause or dispensed with."
The record reveals that four witnesses identified Clark, a former Studebakers employee, as having been present at the lounge on the morning of the murder. He was the last person known to have seen the victim alive. His local address proved to be a vacant building. His permanent address was not local, and he could not be found. It was evident that his testimony would be "essential" and it was likely he had already departed the jurisdiction. The warrant is proper on its face and was signed by a district judge. Under these circumstances the arrest was lawful. Compare State v. Giovanni, 375 So.2d 1360 (La.1979), affirmed after remand, 409 So.2d 593 (La. 1982).
The record also fails to support Clark's contention that his right to counsel was not waived. He was advised of his rights, first by the arresting officers, both orally and in writing, and then by the investigating officers. He immediately handed the latter his bank deposit slips and the written summary of his activities on the day of the murder. He was subsequently interrogated, and during questioning he executed written consents to searches of his home and automobile. He then agreed to give a recorded statement, prior to which he was advised a third time of his rights. Halfway through this statement Clark asked, "What would happen if I asked for a lawyer?" One officer asked if he wished the questions to cease and he answered he did not. Absent some showing to the contrary, and none is made, it must be assumed that Clark elected to proceed without counsel. It follows that the evidence discovered subsequent to the arrest and interrogation is admissible.

Assignment of Error No. 4
Clark contends it was improper not to exclude certain jurors for cause. Of these, the first had seen newspaper accounts of the murder several months prior to trial. The second initially stated that he believed in the principle "an eye for an eye." The third said at first that he would not give consideration to Clark's age or first offender status. The fourth expressed the opinion that capital punishment deterred certain violent crimes. Each of these prospective jurors stated in response to subsequent questioning, however, that he or she would accept and apply the law as given. Our review of the record discloses no basis to conclude otherwise, and no abuse of the "considerable discretion... afforded the trial judge in these matters." State v. Ward, 483 So.2d 578, 583 (La.1986). This assignment has no merit.

Assignment of Error No. 5; Supplemental Assignment No. 10A
Clark contends it was improper to exclude for cause those veniremen who expressed inalterable opposition to the death penalty, and to exclude three potential jurors whose opposition was equivocal. The first contention has never been accepted in Louisiana, see State v. Ford, supra at 1259; State v. Ward, supra at 582-83, and is now foreclosed by Lockhart v. McCree, ___ U.S. *867 ___, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). A review of the record shows the second contention to be meritless as well. Of the three prospective jurors, one indicated he could not vote for the death penalty under any set of circumstances; the second could not conceive of a situation in which she would vote to recommend death, even if the victim were a member of her own family; and the third stated simply that he did not believe in the death penalty. The determination to dismiss these jurors is fairly supported by the record. Under these circumstances there is no error.

Assignment of Error No. 6
Clark argues the trial judge erred in admitting "gruesome" photographs of the victim and diagrams of the paths of the bullets through the victim's head. This assignment has no merit. State v. Ford, supra at 1260; State v. Ward, supra at 586.

Assignment of Error No. 7
"Specific intent" was defined and argued at the close of the trial on guilt. The jury returned its verdict thirty minutes later. During closing arguments in the penalty phase, the prosecutor referred to "premeditation." The jury began to deliberate its sentencing recommendation and shortly the foreman requested clarification of both terms. The defendant has seized on this request to argue that the jury did not understand the elements of the crime of first degree murder, and could not properly have found him guilty as charged. Our review of the record does not disclose that "injustice has been done the defendant" in the guilt phase of trial, see C.Cr.P. 851. This assignment therefore has no merit.

Supplemental Assignment of Error No. 10
Clark argues that the trial judge erred in failing to remove jurors, once chosen to serve on the panel, from the courtroom during voir dire. C.Cr.P. 791. This argument has been rejected before, e.g., State v. Wilson, 467 So.2d 503 (La.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 281, 88 L.Ed.2d 246, rehearing denied ___ U.S. ___, 106 S.Ct. 585, 88 L.Ed.2d 567 (1985); State v. Lindsey, 404 So.2d 466 (La.1981), appeal after remand, 428 So.2d 420 (La. 1983), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246, rehearing denied, 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983), and has no merit.

Supplemental Assignments of Error Nos. 14-25
Clark argues that absent inadmissible hearsay evidence there is insufficient evidence to prove the commission of an armed robbery, or that he committed it, Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Shapiro, 431 So.2d 372 (La.1982), and that absent proof of this crime his conviction for first degree murder cannot stand. R.S. 14:30. In particular he argues that the state impermissibly impeached its own witness, his girlfriend Carolyn Howell, without a showing of surprise or hostility, R.S. 15:487, and by use of prior inconsistent statements made not by her but allegedly made by him. Id.; 15:493. He suggests the trial judge erred in permitting the tellers from his bank to testify as to the amount of the deposits he made on the date of the murder, arguing that the "best evidence" of those deposits was the bank's records. R.S. 15:436. He suggests the customer deposit receipts and teller tapes were inadmissible hearsay evidence, and that one customer deposit receipt and one teller tape should not have been admitted because the teller could not identify these items at trial. He argues finally that an investigating officer should not have been allowed to recount to the jury Clark's explanation for the deposits made on the day of the murder, and other statements made by Clark concerning his business records; and that the same witness should not have been allowed to identify the handwriting in those records as his.
To the contrary, the state proved beyond any doubt at all that a robbery occurred. Studebakers' manager testified that cash receipts were kept on hand in the office until transferred by Wells Fargo. Two of the sales representatives testified they saw Cheswick counting money in the office *868 within an hour of the murder. When the Wells Fargo driver arrived the adding machine was running but there was no money to be found.
The state also proved beyond a reasonable doubt that Clark committed the robbery. Carolyn Howell testified as follows:
"Q. Did he discuss with you a deposit that he made to his account on October 18th?
A. We didn't talk about my expensesI mean, my money that I made and I didn't talk about his. I didn't ask him where he got his money just like he didn't ask me where I got mine.
Q. Did heDo you recall giving a prior taped statement to the Baton Rouge City Police concerning
A. Yes.
Q. And in that statement do you recall that you said that Jeff Clark told you he deposited $2600.00 to that account on October 18th?
A. I don't remember. He said he was getting a share of money from his business partner, but I don't remember how much it was.
Q. Did he tell you that he made a deposit to that account on October 18th?
A. Yes, I guess he would have had to then ... because we had extra money at the time. He wanted to take me out of town to the World's Fair or the zoo or whatever the next weekend.
Q. Do you recall making a statement to the police that he told you that he deposited the sum of $2600.00?
A. I don'tI was in such shock that day. It is hard to remember exactly what I said. I was very nervous just like I am now. It is just hard to remember.
Q. Did he tell you that he deposited a large sum of money to his account?
A. He told me we had some money. We had some extra money ..."
Clark's attempt to characterize this line of questioning as impeachment is not persuasive. When the witness's answers were unresponsive, the prosecutor followed with more specific questions; at no time did the state make any effort to show contradictory prior statements of either Howell or Clark.
The best evidence rule was not violated by the introduction of testimony concerning Clark's bank deposits. R.S. 15:436 provides:
"The best evidence which from the nature of the case must be supposed to exist, and which is within a party's control, must be produced."
While defendant is correct to assert that the best evidence of his deposits is the records of the bank, and not the testimony of the tellers, the bank records were introduced. Defendant is incorrect in the assumption that this statute allows only the introduction of best evidence and prohibits corroborative evidence.
Defendant is also incorrect in asserting that introduction of the customer deposit receipts and teller tapes was improper, see State v. Stuart, 344 So.2d 1006, 1009 (La. 1977); and defendant's claim that the teller was unable to identify several of these is inaccurate. The teller in fact identified each item in question. She stated only that she did not give them to the police.
Nor did the trial judge err in allowing introduction of the investigating officer's testimony. Clark's explanation of the bank deposits made on the day of the murder and his statement that all receipts from his business were recorded in a ledger, both given at the time of his arrest, come within the admissions exception to the hearsay rule. See State v. Lewis, 416 So.2d 921, 924 (La.1982). And while the officer was not qualified as an expert in handwriting analysis, his passing remark in this regard, if not a reasonable inference drawn from personal observation, see State v. Kahey, supra at 491, was harmless. The evidence was seized from Clark's home on information volunteered by Clark and with Clark's permission, and was claimed by Clark as his own. There is no merit to these assignments. The evidence is competent and sufficient to support the verdict.

*869 Supplemental Assignments of Error Nos. 26 and 27

Clark argues that the trial judge erred in instructing the jury that a witness is presumed to speak the truth. In support of this proposition he relies on Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). More nearly in point, we think, is Cupp v. Naughton, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), in which a similar instruction was considered and upheld. As in that case, the instructions given in this one, viewed as a whole, were adequate to impress upon the jury that a defendant is presumed innocent, that the burden to prove guilt rests on the state, and that the jury is "free to exercise its collective judgment to reject what it [does] not find trustworthy or plausible." 414 U.S. at 149, 94 S.Ct. at 401. These assignments have no merit.

Supplemental Assignment of Error No. 28
Clark argues that the state should not have been allowed to impeach a defense witness through evidence of a prior arrest for armed robbery and second degree murder. This witness was called to testify that Bell and Hood were lying on the stand. He denied knowing or ever meeting the investigating officers in this case. One of the officers was called in rebuttal and testified that he and his partner, the second investigating officer, had arrested the witness. The witness's arrest record was admitted without objection.
In State v. Sweeney, 443 So.2d 522, 529 (La.1983), we noted:
"... Louisiana jurisprudence has generally permitted full scope of cross-examination in the interest of exposing for trier of fact evaluation any bias or interest of the witness which migh influence his perceptions or color his testimony....
Only one prior arrest was raised by the state. The questioning went to whether [the witness] had been arrested by the same two officers who arrested and testified against defendant. The testimony was offered solely to show bias, interest or corruption in this particular case...."
The Sweeney rationale is applicable here; the evidence is admissible under R.S. 15:492.

Supplemental Assignments of Error Nos. 29 and 30
In the first of these assignments Clark complains that certain hearsay evidence was improperly admitted through the following testimony of one investigating officer:
"Q. When he was brought back to Baton Rouge did he make any incriminating statements that evening?
A. Yes.
Q. And would you give us the substances of those statements?
A. The one that I personally heard was... uhI could have gone to West Point, meaning the military academy,uhand that was the worse mistake of my life uhup until this thing, I mean. He made several other statements of an incriminating nature which were related to me by other investigators, but that I didn't personally hear."
This assignment lacks merit. First, this testimony is not hearsay. Second, all the investigating officers appeared at trial and testified to Clark's statements, and all were subject to thorough cross-examination by defense counsel.
In the second of these assignments Clark argues that evidence of a plea bargain was improperly admitted before the jury through the following testimony of an investigating officer:
"Q. Did you hear any discussion concerning the imposition of the death penalty in this case?
A. Yes, I was present for some of that.
Q. And what statement was that?
A. Mr. Clark indicated that he was very concerned about receiving the death sentence if convicted of this crimeuhand he attempted to negotiate a deal whereby we would guarantee that he would not *870 receive the death sentence if he would, in fact, tell us the truth about his knowledge of this case. I told him that I had no authority to grant that.
Q. He was the one who initiated the discussion of trying to get a deal?
A. That is correct."
This is not a situation such as that presented in State v. Joyner, 228 La. 927, 84 So.2d 462 (La.1955), where a defendant pleaded guilty to the charges against him but later withdrew the plea, and where this court held that court minutes reflecting the plea and its withdrawal were improperly admitted into evidence. Nor is the present case like State v. Gaspard, 301 So.2d 344 (La.1974) (on rehearing), where the defendant was offered a plea bargain but refused it, and where this court granted a mistrial on the basis of the prosecutor's reference to those negotiations. In the present case the defendant did not plead to anything, or reject a bargain offered by the state. Here the defendant asked the detective if he could avoid the death penalty by telling what he knew about the case. The defense obviously did not consider the subject prejudicial because he did not object and point up the error, if any; further, the defense lawyer himself later adduced the same testimony from Ossie Brown, who was the district attorney when defendant was arrested.

Supplemental Assignments of Error Nos. 43 and 44
Clark argues that the state improperly discussed appellate review in the sentencing phase, and refers us to the following statement made by the prosecution in the opening statement of the sentencing phase:
"This is the one and only type of crime that the legislature of the State of Louisiana has seen fit to give the sentencing responsibility to the jury. It is the one and only circumstance in the law where the law of the state sanctions the forfeiture of a human life under very controlled and exact circumstances. What the legislature has done, in essence, is to take the function of sentencing out of the hands of the judge who, I submit to you, is most likely the wiser and the more familiar person than anyone with the lawuhand with the functioning of sentencing. And out of the judge's hands, the legislature has placed the responsibility of handing down the sentence to 12 members of the jury. It requires that all 12 members of the jury concur before a death sentence can be imposed....
I might add to you that should, in this case, the jury come back with a finding of death the case automatically must be reviewed by the Louisiana Supreme Court. It requires that a majority of the justices of that court review and affirm the sentence that you hand down. When they make that review the law gives factors the Supreme Court must look at in reviewing your sentencewhether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factorswhether the evidence supports the jury finding of a statutory aggravating circumstanceuhand, finally, and most importantly, whether the evidence is disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. What the Supreme Court does is to consider all other first degree murder cases throughout the State of Louisiana, and should the death sentence be handed down in this case it would compare it to other similar cases. Should they find that the verdict of the jury, if the death sentence is imposed only, is out of proportion they would reverse your decision...."
We most recently cautioned against this type of argument in State v. Jones, 474 So.2d 919, 930-31 (La.1985), where we quoted extensively from previous jurisprudence of this court:
"`Any prosecutor who refers to appellate review of the death sentence treads dangerously in the area of reversible error. If the reference conveys the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one, or if the reference *871 contains inaccurate or misleading information, then the defendant has not had a fair trial in the sentencing phase, and the penalty should be vacated.
`But virtually every person of age eligible for jury service knows that death penalties are reviewed on appeal. There is no absolute prohibition against references to this fact of common knowledge, and this court should not impose an absolute prohibition, since such a reference does not necessarily serve to induce a juror to disregard his responsibility. The issue should be determined in each individual case by viewing such a reference to appellate review in the context in which the remark was made.'" (Quoting State v. Berry, 391 So.2d 406, 418 (La. 1980), cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981)).
We distinguished cases in which such argument was allowed, e.g., State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. Moore, 414 So.2d 340 (La. 1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983), from several in which reversible error was found. State v. Robinson, 421 So.2d 229 (La.1982); State v. Willie, 410 So.2d 1019 (La.1982). We noted that the former involved remarks "so brief or innocuous that it would not reasonably induce a juror to believe that his responsibility was lessened by appellate review," while in the latter case the arguments were "lengthy," "inaccurate," or both. It was also noted that the United States Supreme Court had recently reversed a death sentence where the prosecution had stated, "they would have you believe that you're going to kill this man and they knowthey know that your decision is not the final decision," id. at 931, citing Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), but distinguished that case on the trial judge's failure to admonish the jury. "[T]he ultimate question," we said, "is whether the remark deprived defendant of a fair trial at the sentencing hearing." Id.
It is not our intention to fine tune the distinction between argument of excessive length from that which is not, or between argument which presents a sufficiently accurate description of the appellate process from that which does not, or to consider, in a successive round of cases, various combinations of length and accuracy. While we again decline to impose an absolute prohibition against such argument, recognizing that the jury should be instructed as to its responsibility and that of the reviewing court, we hold that the argument presented in this case so denigrated the responsibility of the jury as to deprive the defendant of a fair determination of sentence.
The first part of the quoted statement, standing alone, is proper. It informs the jury of its unique sentencing function in a capital case and stresses the grave importance of the task. Except perhaps for the first sentence in the second part of the argument, which states a "fact of common knowledge," this section is improper. It has the opposite effect. No purpose is served by explaining to the jury various grounds for reversal on appeal, however infrequently invoked by this court, except to suggest that its recommendation can be disregarded for numerous reasons. This is not a valid purpose. We note, finally, that no objection was raised and no admonishment was given.

Supplemental Assignment of Error No. 57 (a-z; aa-ii)
In this assignment Clark contends his counsel was ineffective at voir dire, at trial and during the sentencing phase. The standard of competence required of defense counsel in a criminal case is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, rehearing denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984):
"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not *872 functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable...."
Various of the errors allegedly committed by defendant's counsel relate to his failure to object to testimony and other evidence ruled admissible in this opinion. Others relate to his failure to object to argument which we have found unobjectionable. Effectiveness of counsel is not measured by the number of meritless objections raised. These alleged errors are not considered. We have otherwise reviewed the record of the voir dire and the trial and are unable to agree that counsel's assistance was ineffective within the meaning of Strickland. Although we question in particular the failure to object to references to the ski mask and gloves, which were not shown to have any connection with the crime, and the failure to object to the introduction of photographs of the victim and his mother, which were not relevant, in view of the overwhelming evidence of defendant's guilt it cannot be said that counsel's errors in these respects deprived defendant of a trial "whose result is reliable," or that the outcome might have been different had objections been entered.
Assistance during the sentencing phase might present a closer question were it in a posture for decision. Clark, a first offender, did not take the stand. Members of his family did not testify in his behalf. We are told that they were not allowed to do so, and that a sister was told not to enter the courtroom. Opening argument was waived; mitigating circumstances were not presented, and little was said in favor of life imprisonment. Such a strategy is inappropriate in a capital case. On this record it is inexplicable.
This court does not sit as a finder of fact, however, and ought not decide the question solely on the basis of argument and affidavits filed on appeal. There might be reasonable explanations for what seems to be ineffectiveness. In such a case a petition for post conviction relief should be filed in the district court, where evidence can be taken and a record compiled. C.Cr.P. 924; State v. Prudholm, 446 So.2d 729, 737 (La.1984).
The conviction is affirmed. The sentence is set aside and the case is remanded for further proceedings.
LEMMON, J., concurs in part and dissents in part and assigns reasons.
MARCUS, J., concurs and assigns reasons.
COLE, J., concurs in affirmation of the conviction and dissents from reversal of the death sentence.
LEMMON, Justice, concurring in part and dissenting in part.
I agree that the conviction should be affirmed, but I do not agree that the prosecutor's closing argument in the penalty phase requires reversal of the death sentence.
After explaining to the jurors that a different sentencing procedure is used in capital cases because of the ultimate penalty of "the forfeiture of a human life", the prosecutor briefly and accurately reviewed the appellate process following imposition of a death penalty. Appellate review of death sentences is a fact of common knowledge, and the prosecutor's correct and innocuous comments on the overall process, taken in context, did not suggest to the jurors that they should disregard their awesome responsibility because their momentous decision was not final and was subject to judicial review.
MARCUS, Justice (concurring).
I concur in the reversal of the death sentence, being of the opinion that the United States Supreme Court in Caldwell v. Mississippi, ___ U.S. ___, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), compels this result.