699 So.2d 865 (1997)
STATE of Louisiana
v.
Dale Dwayne CRAIG.
No. 95-KA-2499.
Supreme Court of Louisiana.
May 20, 1997.
*866 Richard M. Upton, Michael D. Lee, George R. Trelles, Baton Rouge, for Applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moreau, District Attorney, Thomas C. Walsh, Jr., Alexandria, John A. Cannon, Baton Rouge, for Respondent.
CALOGERO, Chief Justice.
On September 14, 1992, defendant Dale Dwayne Craig brutally murdered Kipp E. Gullet, an 18 year-old freshman student at Louisiana State University. For that crime, defendant was convicted of first degree murder and sentenced to death. This is a direct appeal from that conviction and sentence. La. Const. art. V, § 5(D). Finding no reversible error in any of the numerous assignments of error, both argued and unargued, we affirm both the conviction and the sentence.

FACTS
The defendant, Dale Dwayne Craig, and three others, Zebbie Berthelot, James Conrad Lavigne and Roy Maurer, were indicted for the first degree murder of Kipp E. Gullet. The latter three negotiated a deal with the District Attorney; Lavigne and Berthelot testified against defendant at trial.[1]
*867 Near midnight on September 14, 1992, the victim, Kipp Gullet, drove his Ford Bronco into the parking lot of Kirby Smith dormitory on the Baton Rouge campus of Louisiana State University. Gullet, a freshman, was returning to his room after visiting with his friend, Christy White. As Gullet began to exit his truck, defendant rushed up and struck him in the face with a pistol. Defendant and his companions had spent much of the evening lurking in parking lots looking for a car to steal because defendant needed transportation to visit his girlfriend.
Screaming for his companions to get into Gullet's truck, defendant held his gun to Gullet's head in the back of the truck while the others got in the truck and Maurer drove them out of the parking lot. As they were driving, Gullet pled with his captors, offering them his money and his truck and telling them that his parents were rich and would pay for his safe return. The victim also attempted to keep his face hidden in his hands in an effort to convince his captors that he would not be able to identify them if they were to let him go, but defendant made him sit up straight to "look normal." While the victim continued to cry and beg for mercy, defendant probed him for information on whether his disappearance would be noticed. He also asked the victim if he had "gotten any" from his girlfriend that evening.
As the group drove around town looking for a gas station without too many cars or people around, defendant and his companions debated the fate of the victim. Defendant expressed his decision to kill the victim, but the others suggested beating him into unconsciousness. Defendant seemed to acquiesce, and they drove to a secluded construction site near South Kenilworth Crossing in East Baton Rouge Parish. Defendant and Lavigne, both armed with handguns, pulled the victim from the vehicle and marched him at gunpoint away from the truck. They reached a grassy area where Lavigne struck the victim in the head with the butt of his gun. The victim fell to the ground and Lavigne began to walk back to the Bronco. As the victim lay on the ground in a fetal position, defendant knelt at his side and fired three bullets through his head, killing him.
The four drove quickly away from the scene. Defendant told his friends that he had killed the boy to protect their identities. Defendant then said to the group, "I love you all, you are my boys. If you say one f___ing word, I'll kill you, too." To Maurer, he said, "I told you I was hard." Defendant then asked if the group should go kill anybody else while they were at it, then answered his own question by responding, "No, the game warden might get pissed."
Defendant drove the Bronco to visit his girlfriend, who was at his house. He told her, in detail, of his crime and of how he decided to kill his victim when one of the others had used an identifying name.[2] Defendant and his girlfriend then planned to drive the Bronco to Bogalusa the next day. The following day, however, defendant changed his mind as they began to leave and decided instead to destroy the Bronco. Defendant ripped the stereo speakers and stereo from the car. Accompanied by his mother, his girlfriend, and Lavigne, who all followed in a separate car, defendant took the truck to the levee, where he set fire to the vehicle. Police later found at defendant's residence, through the execution of a search warrant, the pieces of stereo equipment and the victim's keys.
Soon after daybreak, the East Baton Rouge Parish Sheriff's Department investigated the suspected arson of a Ford Bronco found burning at the foot of the Mississippi River levee. Deputies discovered that the registered owner was the victim's father and that the truck was supposed to be in the possession of his son. After Ronald Gullet (the victim's father) was notified concerning the vehicle, he contacted the Louisiana State University Police Department to relate that he was unable to locate his son. Simultaneously, deputies were investigating reports of a body found at a construction site near *868 the Kenilworth Ridge Apartments. Officers conducting the two investigations quickly realized the connection between the two crimes and identified the body as Kipp Gullet.
Based upon information from an anonymous caller, who stated that defendant Craig, Lavigne, Maurer and Berthelot were involved in the incident, police quickly arrested the four suspects. Berthelot, who was only 15 at the time, confessed to the officers in the presence of his mother. Based upon this statement and a subsequent statement given by Maurer, the police arrested defendant, who was charged with first degree murder.
Defendant initially pleaded not guilty, but later attempted to enter a plea of guilty, skip the guilt phase of the trial, and go straight to the penalty phase. The trial judge refused his attempted plea of guilty and the case went to trial. Defendant was found guilty of first degree murder on October 20, 1994, after a three-day trial. Following another three-day penalty phase, the jury found as aggravating factors that the crime was committed in the course of an aggravated kidnapping and armed robbery, and that the offense was committed in an especially heinous, atrocious and cruel manner. The jury unanimously determined that defendant should receive the death sentence, which the district judge thereafter imposed. Defendant now perfects his appeal in this Court on the basis of 57 argued and unargued assignments of error.[3]

DISCUSSION

A. FAILURE TO ALLOW DEFENDANT TO PLEAD GUILTY

Defendant contends that the trial court erred in denying his motion to enter a plea of guilty, waive the guilt phase of the trial and proceed directly to the penalty phase. At the time of defendant's trial in 1994, La.C.Cr.P. art. 557 provided, "A court shall not receive an unqualified plea of guilty in a capital case. If a defendant makes such a plea, the court shall order a plea of not guilty entered." Jurisprudence interpreted this article to mean that a court is prohibited from accepting a guilty plea to a charge of first-degree murder unless that plea is qualified to exclude the possibility of the imposition of capital punishment. State v. Jett, 419 So.2d 844, 850-51 (La.1982) ("There is a well founded legislative policy against a person accomplishing ... judicial suicide."). In 1995, Art. 557 was revised, and now provides that capital defendants may plead guilty and proceed directly to the penalty phase, if such plea is made "with the consent of the court and the state."[4]
In the instant case, there was no agreement between the defense and the state to exclude the possibility of capital punishment. The attempted plea was therefore not "qualified," and the trial court was correct to refuse it.[5] Further, even had the plea been properly qualified, nothing in either version of Art. 557 requires a court to accept a qualified plea of guilty in a given case; rather, the decision is left to the judge's discretion. See Jett, 419 So.2d at 851; State v. Green, 221 La. 713, 60 So.2d 208, 213 (1952). As to the 1995 amendment to Art. 557, defendant does not argue that it should apply retroactively to his trial, but rather cites the revised statute for the proposition that its predecessor should be read to allow unqualified pleas of guilty. This clearly conflicts *869 with the extant jurisprudence at the time of defendant's trial.
Consequently, this assignment lacks merit.[6]

B. REQUESTED JURY INSTRUCTION

In a related assignment of error, defendant contends that the trial court erred in failing to charge the jury, per his request, that he was prevented by law from entering an unqualified plea of guilty to first degree murder. Initially it should be noted that defendant requested this charge be given at both the guilt and penalty phases of the trial. Both requests were denied by the court; however, defendant's argument pertains only to the instruction not being read at the penalty phase. Specifically, defendant argues that because he was precluded from entering a plea of guilty and "thus presenting [this as] mitigating evidence to the jury, it was necessary for the court to instruct the jury that the defendant could not plead guilty and thereby put evidence of his acceptance of responsibility before the jury."
Pursuant to La.C.Cr.P. art. 807, "[a] requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." Any such charge must be supported by the evidence. State v. Toomer, 395 So.2d 1320 (La. 1981).
In the instant case, defendant introduced no evidence either at the guilt phase or at the penalty phase that he attempted to plead guilty to first degree murder; rather, the only mention of it was during defense counsel's guilt phase opening argument, and his penalty phase opening and closing arguments. Consequently, because defendant's inability to plead guilty under the law was not supported by the evidence, he was not entitled to the instruction regarding La. C.Cr.P. art. 557. See, e.g., State v. Belgard, 410 So.2d 720, 726 (La.1982). This assignment lacks merit.

C. FAILURE TO GRANT MISTRIAL

Defendant contends that the trial court erred in denying his motion for mistrial based on the defendant's allegation that the state, in its closing argument, impermissibly alluded to defendant's failure to take the stand. La.C.Cr.P. art. 770(3) provides that a mistrial "shall be ordered" when the prosecutor "refers directly or indirectly to ... [t]he failure of the defendant to testify in his own defense."
In the instant case, the prosecutor's comments merely addressed the theory of defense, and did not directly or indirectly refer to defendant's failure to testify. The prosecutor made the following argument during rebuttal at the penalty phase:
Mr. Upton [defense counsel] wants to now tell you, well, you know, maybe those guys who testified, maybe they were somewhat biased. Well, ladies and gentlemen, none of those guys had a gun to that boy's head, none of those guys desired to shoot and kill him in cold blood. And, more importantly is they were on the stand, he had the opportunity to show any bias ... [Objection by defense-Trial court overruled]. He had the ability to cross examine those witnesses. But, if you remember, when they took the stand, do you know what he never cross examined them about? The event. He never asked them a question about the event, the murder itself, the brutality. He didn't ask that question, because you don't ask a question that you know what they're going to respond to....
It appears from the record that the prosecutor's comments referred to the unrebutted culpability of defendant as the triggerman. As the state points out in brief, "[t]he comments initially refer[ed] to defendant's argument that testimony by the co-defendants was biased." The state merely commented on defense counsel's failure to cross-examine co-defendants Berthelot and Maurer vigorously as to the events of the evening in *870 question and not defendant's failure to take the stand. Furthermore, to a certain extent, the state also was alluding to the fact that the defense strategy at the guilt phase was to concede defendant's guilt. Throughout the guilt phase, defense counsel did not contend, for example, that one of the co-defendants was the triggerman. Consequently, these comments were not indirect references to the fact that defendant did not testify, but rather comments on defense counsel's strategy. This assignment therefore lacks merit.

D. FAILURE TO QUALIFY EXPERT

Defendant contends that the trial court erred in refusing to qualify Dr. Craig Forsyth as an expert witness in the fields of sociology, criminal deviance, and substance abuse.
Pursuant to La.C.E. art. 702, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In reviewing the decision of a trial court in qualifying a witness as an expert, courts typically place the burden on the party offering the witness as an expert and consider that the decision to accept or reject the offer rests within the sound discretion of the trial court. 2 Wigmore, On Evidence §§ 560-561 (3d ed.). This Court employs that standard. See State v. Watson, 449 So.2d 1321 (La.1984) (the ruling of the trial court will not be disturbed absent manifest error); State v. Wheeler, 416 So.2d 78 (La.1982); State v. Montana, 421 So.2d 895 (La.1982); Art. 702, comment d. Courts will also look to whether a witness has previously been qualified as an expert. State v. Lewis, 351 So.2d 1193 (La.1977); State v. Perkins, 337 So.2d 1145 (La.1976). Furthermore, the refusal of the trial court to receive such evidence will rarely, if ever, provide grounds for reversal. See State v. Stucke, 419 So.2d 939, 944 (La.1982).
In the instant case, the crux of the problem is that defendant does not make clear how Dr. Forsyth's "specialized knowledge" would have assisted the trier of fact in understanding the evidence in the instant case. Dr. Forsyth holds a Ph.D. in sociology and is a certified drug abuse counselor who has authored numerous articles and has taught numerous courses in the academic arena.
According to defendant,
Dr. Forsyth was engaged by the defendant to give evidence to the jury about the defendant's background and sociological effects of his family environment, school experiences, social experiences and drug history on his personality and behavior. Dr. Forsyth was particularly qualified to prepare and present this evidence to the jury based on his special interest in criminal deviance, criminology, the effects of drug abuse and his prior experience working on capital cases....[7] Dr. Forsyth's testimony was the center pin around which the entire penalty phase case was constructed. Dr. Forsyth's testimony was to tie together all of those elements of the life of the defendant to which the previous witnesses testified. Without the testimony of Dr. Forsyth to tie all of those elements together, the jury was left without the crucial opinions that would have focused the jury on why those factors should be mitigating factors.
First, defense counsel attempted to qualify Dr. Forsyth in the area of the effects of drug abuse and criminality. Dr. Forsyth testified that he had close to 30 years experience in substance abuse counseling of mostly heroin addicts. Furthermore, he also testified that he had conducted a study of over 100 prison inmates and the effect of intoxication with respect to the crimes that they committed.[8] Dr. Forsyth further stated that *871 he had also studied the problem of alcoholism with respect to college students. In failing to qualify Dr. Forsyth as an expert in drug abuse counseling, the trial court found that although Dr. Forsyth "probably has some experience and some knowledge in the area of substance abuse counseling, ... I do not believe that he possesses the necessary expertise to qualify as a substance abuse counselor or an expert in that area."
Although this specific finding is debatable, the record reflects that there was very little evidence of defendant's drug use. First, there was no evidence to suggest that defendant was under the influence of drugs or alcohol at the time of the offense. Second, although the defense put on several witnesses at the penalty stage who testified that defendant had used drugs, there was no evidence that defendant was a drug addict or routinely sold drugs. Furthermore, there is some evidence to suggest in the record that due to a serious fall in defendant's early teenage years, which resulted in the loss of part of his liver, that alcohol or drugs might have a heightened or more intensified effect on him. This type of evidence, however, would have been more properly elicited from a medical doctor. Clearly, there was nothing to suggest that Dr. Forsyth had any expert knowledge about the biological effects of drugs or alcohol. Consequently, Dr. Forsyth's knowledge in this area would not have assisted the jury in understanding the evidence or determining a fact in issue. See La.C.E. art. 702; La.C.Cr.P. art. 905.5(e) ("At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.").
With respect to Dr. Forsyth's qualification as an expert in crime and deviance, the problem is mainly that the area in which defendant wished to utilize expert testimony was not Dr. Forsyth's area of expertise. Dr. Forsyth's testimony suggests that he did not have the requisite "knowledge, skill, experience, etc." to provide the expert testimony that defendant wished to elicit. La.C.E. art. 702. Although it is unclear as to what specifically defense counsel wished Dr. Forsyth to testify about, it appears defense counsel wanted him to testify to the effects that defendant's background (i.e., childhood, sexual abuse, drug involvement, etc.) had on defendant's criminality. Dr. Forsyth testified that he was a criminologist (a specialty area of sociology) and specialized in "criminology deviance," which encompasses, for example, how "family interaction patterns contribute to delinquency or being a deviant lifestyle." However, all of his personal studies and developed methodologies centered around subjects and models very different from that of defendant. Dr. Forsyth stated that he conducted extensive research and compiled statistical information in the following areas: 1) How merchant seamen are molded by "total institutions"; 2) "[S]tudy of street people to see how people end up street people"; 3) Theory that "explains how people convert from ... normal identities to a deviant or criminal identity and back and forth"; 4) Effects of the maritime industry regulation and how it molded men within the industry historically over two hundred years; 5) Violent crime and some of the variables that contribute to violent crime in America; 6) Structural changes and Property Crime, what factors contribute to property crime; 7) historical analysis of satanic cults; 8) Influence of Fear or Crime Gender in a southern culture on carrying firearms; 9) Study of 50 women offenders and 50 male offenders and the amount of violence they had in their family of origin, violence they had in their own families, and their current situation; 10) Female participation in embezzlement, forgery and counterfeiting crimes; 11) parade strippers and being naked in public; 12) elderly crime; 13) female criminality; and 14) effects of poverty on crime.
Although Dr. Forsyth has conducted extensive research about the different effects various factors have on crime and violence, none of these areas directly pertains to sociological *872 factors in the instant case. The background information that the defense did present was that defendant had been sexually abused, he occasionally took drugs, he did not know who his father was, and he was small in stature. None of these factors was ever really addressed by Dr. Forsyth, nor does any of his research appear to encompass them. Part of the problem in the instant case is that defense counsel's direct examination is somewhat of a line-by-line recitation of Dr. Forsyth's curriculum vitae and nothing more. Defense counsel does not tie together how Dr. Forsyth's specialized knowledge would have assisted the jurors in the instant case any more than their common sense interpretation of the objective mitigating evidence, including the testimony of Dr. Turin, that the defense did present: that the environmental factors in a person's background may contribute to, or even cause, his criminally deviant behavior.
Consequently, the trial court did not abuse its discretion in not qualifying Dr. Forsyth as an expert in this particular case. This assignment therefore lacks merit.

SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report and the Department of Corrections has submitted a Capital Sentence Investigation Report. In addition, the state filed a Sentence Review Memorandum.
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate that defendant is a white male born on September 22, 1974. He was 17 years old, only eight days away from his eighteenth birthday, at the time of the offense. Defendant was married two days after the offense on September 16, 1992. He has fathered one child by this marriage who was born after his incarceration.[9] Defendant was the only child of Geneva Howell Craig, who was married to Dewayne Taylor at the time of his conception; however, both defendant and Mrs. Craig believe his father is a man with whom Mrs. Craig had a brief affair.[10] Neither man has acknowledged defendant as their son nor has defendant had contact with them. Mrs. Craig divorced Taylor in 1976. She also had two children with her first husband (who died in Vietnam) before defendant's birth, both of whom both died in infancy. Defendant grew up in North Baton Rouge (a predominantly black neighborhood) and was raised by his mother and maternal grandparents who lived four houses away. In school, defendant completed the eighth grade and has an IQ above 100 placing him in the "high" intelligence level.
A psychiatric evaluation reveals that defendant was diagnosed as a sociopath personality and suffers from post traumatic stress disorder arising out of an incident of sexual molestation. According to the psychologist's evaluation, defendant stated that he had sex at age nine with his mother's stepsister, Melody, who was 18 years old at the time. "According to [defendant], he and his mother traditionally spent Christmas Eve night at his Grandmother's house. On this particular occasion, Melody was also in Baton Rouge and slept in the same bed as the two of them, presumably because of lack of sleeping space. During the night, Dwayne states that Melody approached him sexually and they subsequently had intercourse while his mother slept next to them."
*873 Defendant also claims that he was abusing both drugs and alcohol at the time of the offense, although little evidence was introduced at the guilt or penalty phases on this point. Furthermore defendant admitted to using drugs and alcohol since the age of 11 years and first experimented with marijuana, then LSD. Defendant also claims to have used inhalants such as paint thinner and prescription drugs such as Xanax, Dilaudin and Ecstasy. Defendant's employment history consists only of minimum wage employment at Hi-Nabor and at a landscaping company.
Finally, the Capital Sentence Investigation Report indicates that defendant, while a juvenile, was first arrested on January 17, 1985, for simple burglary. On April 16, 1985, he was placed on Informal Adjustment Agreement and on October 30, 1986, the matter was dismissed. On October 16, 1986, defendant was arrested for illegal possession of stolen things. On May 27, 1987, disposition was deferred pending defendant's adjustment to the District Attorney's Diversion Program. On August 24, 1988, adjudication was vacated and the charge was dismissed. On November 12, 1988, defendant was arrested for misdemeanor theft and on November 12, 1988, this charge was also dismissed. On August 30, 1990, defendant was arrested for theft of a bicycle. On March 15, 1991, disposition was deferred for one year and defendant was placed on supervised probation for one year. On April 13, 1991, defendant was arrested for illegal carrying of a weapon (.25 caliber handgun); on July 13, 1991, defendant was arrested for carrying a concealed weapon. On December 4, 1991, defendant received a six month suspended commitment to the Department of Public Safety and Corrections and was placed on one year supervised probation. On August 6, 1991, defendant was arrested for forcible rape and aggravated assault; however, these charges were dismissed on December 9, 1991. Furthermore, according to the probation report, on November 4, 1991, defendant was stopped in the Chimes Street area in Baton Rouge by the Street Gang Task Force. He was searched and a large knife was found and confiscated. On November 6, 1991, a probation violation hearing was held. Defendant was found in contempt and sentenced to five days in detention. In addition, it should be noted that defendant was on supervised probation at the time he committed the present offense.

A. Passion, Prejudice, and other Arbitrary Factors

Defendant contends in an unbriefed assignment of error that the jury's determination of sentence was a result of passion, prejudice, arbitrariness and caprice. Defendant also contends that the trial court's rulings pertaining to his inability to enter an unqualified plea of guilty to first degree murder and the failure to qualify Dr. Forsyth as an expert resulted in the impermissible curtailing of defendant's right to present mitigating evidence. As discussed supra, the trial court's rulings were correct on the merits and jurisprudence dictates that this evidence was properly excluded. Defendant makes no other viable claims. In addition, a review of the record shows that it contains sufficient facts warranting the imposition of the death penalty, and does not suggest that defendant's sentence was the result of passion, prejudice or any other arbitrary factors.

B. Aggravating Circumstances

At trial the state argued two aggravating circumstances existed: (1) defendant was engaged in the perpetration of armed robbery and aggravated kidnapping and (2) the offense was committed in an especially heinous, atrocious or cruel manner. The jury found the existence of both circumstances.
Defendant argues in his Sentence Review Memorandum that there was insufficient evidence to support a finding that the offense was committed in an especially heinous, atrocious or cruel manner. This Court has held that the statutory aggravating circumstance of heinousness is to be given a "narrowing construction." State v. Sonnier, 402 So.2d 650, 659 (La.1981). For the circumstance to be validly returned by the jury, there must exist evidence such that the jury could find, beyond a reasonable doubt, elements of torture, pitiless infliction of unnecessary pain, or serious bodily abuse prior to death. See State v. Brogdon, 457 So.2d 616, 630 (La.1984); State v. Sawyer, 422 So.2d 95 (La.1982). Although the defense did not request a limiting instruction in this *874 case, the court nevertheless instructed the jury on heinousness:
For a crime to be heinous, atrocious or cruel so as to constitute an aggravating circumstance permitting the imposition of the death penalty, the crime must involve torture or pitiless infliction of pain on the victim, which may be either physical or psychological.
This Court has also held that the murder must be one in which the death was particularly painful and one carried out in an inhumane manner. State v. Baldwin, 388 So.2d 664 (La.1980). Furthermore, a finding that the wounds were inflicted to kill, not to maim or inflict pain, precludes a finding of the aggravating circumstance that the murder was especially heinous, atrocious or cruel. State v. Tassin, 536 So.2d 402 (La.1988).
This Court has found the existence of this aggravating circumstance in cases where the victims experienced great pain and were aware of their impending doom. State v. Rault, 445 So.2d 1203 (La.1984) (victim was raped, strangled, stabbed in the neck and shot twice); State v. Flowers, 441 So.2d 707 (La.1983) (a 70 year-old widow was severely beaten, raped and strangled in her home); State v. Willie, 436 So.2d 553 (La.1983) (victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed).
In the instant case, the state argued that this murder was particularly heinous because prior to being shot three times at close range, the victim was driven around the Baton Rouge area for 40 or 50 minutes with defendant and his companions. The state pointed out that the victim was crying the whole time and pleading for his life. Although Berthelot claimed he told the victim that they would not kill him and that they were only going to hit him on the head so that he would pass out, testimony at trial revealed that defendant and his companions discussed killing the victim in his presence. On the other hand, however, the coroner's testimony showed that the first shot killed the victim; the remaining shots were presumably fired after the victim was unconscious or dead.
In any event, even if we were to decide that the jury's finding with regard to the latter aggravating circumstance was erroneous, there is still another aggravating circumstance uncontested by the defendant and clearly supported by the record. The evidence provided by the co-perpetrators clearly established that the taking of the victim's car at gunpoint and the subsequent killing of the victim approximately 40 minutes later formed a single continuous transaction supporting the jury's determination that the victim died during the course of both an armed robbery and an aggravated kidnapping. See State v. Anthony, 427 So.2d 1155, 1158 (La.1983) (under felony murder doctrine, the felony and the homicide need not occur simultaneously as long as they take place during a single, "continuous transaction without a significant break in the chain of events"). This Court has held that only one aggravating circumstance is needed to return a verdict of death. See State v. Welcome, 458 So.2d 1235 (La.1983). The failure of one statutory aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190, 201; State v. Deboue, 552 So.2d 355, 368 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); State v. Byrne, 483 So.2d 564, 575 (La.1986). Here, the evidence of the possibly invalid circumstance did not interject an arbitrary factor into the proceedings. As previously noted, evidence of the manner in which the offense was committed and of the nature of the victim's injuries were all relevant and properly admitted at trial.

C. Proportionality

Although the Federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990). In the instant case, defendant contends that his sentence is unconstitutionally excessive and disproportionate to other sentences rendered in East Baton Rouge Parish, specifically noting his youth at the time of the offense. This Court, *875 however, has vacated only one capital sentence on grounds it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1 (La. 1979), although it effectively decapitalized another death penalty reversal on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
Jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately thirteen occasions. Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the 19th JDC that defendant's sentence is not disproportionate. See State v. Williams, Docket # 7-94-871 (appeal pending) (defendant approached the victim, who was sitting in his truck, and demanded money; when the victim hesitated, defendant shot him in the head); State v. Brumfield, Docket # 1-93-865 & State v. Broadway, Docket # X-XX-XXXX (appeals pending) (Defendants were convicted of the first degree murder of Corporal Betty Smothers, who was escorting Piggly Wiggly Grocery Store Manager Kimen Lee to the bank, when Broadway and Brumfield opened fire on the car); State v. Scales, 93-2003 (La.5/22/95); 655 So.2d 1326 (The nineteen year old defendant, while engaged in the armed robbery of a Church's Fried Chicken, shot and killed one of the employees); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (During the armed robbery of the Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Clark, 492 So.2d 862 (La.1986) (original sentence of death set aside and life imposed after reversal, defendant shot and killed an employee of Studebaker's Lounge while engaged in an armed robbery); State v. Williams, 383 So.2d 369 (La.1980) (defendant shot and killed the victim during an armed robbery of an A & P Grocery Store); State v. Clark, 387 So.2d 1124 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981), rev'd in habeas petition, Clark v. Louisiana State Penitentiary, 694 F.2d 75 (5th Cir.1982) (defendant stabbed and shot to death the night manager of a Red Lobster restaurant during an armed robbery); State v. Williams, 392 So.2d 619 (La.1980) (defendant, while robbing an Exxon service station, shot and killed an employee; jury recommended death, but sentence was reversed; on remand, jury recommended life).
Furthermore, with respect to defendant's youth at the time of the crime, it should be noted that his age (i.e., 17 years) does not per se exempt him from the death penalty. See Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). In the 19th JDC, it appears that the youngest defendant to receive the death penalty was 19 years old. State v. Scales, 93-2003 (La.5/22/95); 655 So.2d 1326. However, a review of the entire state reveals that the death penalty has been imposed at least twice on 17-year-olds. See State v. Comeaux, 514 So.2d 84 (La.1987) (Defendant received the death penalty; however, this Court reversed his death sentence and remanded for a new penalty hearing)[11]; State v. Prejean, 379 So.2d 240 (La.1979).
Furthermore, considering the fact that this case is an armed robbery and the cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery, it is nearly impossible to conclude that the sentence of death is disproportionate in this case. See State v. Seales, 93-2003 (La.5/22/95), 655 So.2d 1326; State v. Lindsey, 543 So.2d 886 (La.1989); State v. Messiah, 538 So.2d 175 (La.1988). In addition, although certainly not dispositive of the issue, it should be noted that defense counsel did not argue that the youth of defendant militated against imposition of the death penalty.
*876 In light of the cases reviewed above, the sentence is not disproportionate.[12]

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.R.S. 15:567, until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
JOHNSON, J., not on panel. Rule IV, Part 2, § 3.
NOTES
[1] Pursuant to the state's Giglio notice, Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), in exchange for truthful testimony at defendant's trial, Lavigne would not receive the death penalty (no other commitments were made); Maurer would receive a 25 year sentence (no commitment as to the charge); and Berthelot would also receive a 25 year sentence (no commitment as to the charge). Maurer did not testify; the reason is not clear from the record.
[2] Defendant's girlfriend (Nicole Craig), whom he married one day after the crime, waived any claim of spousal privilege and testified against defendant at trial.
[3] The bulk of those assignments either address settled principles of law or were not argued in brief or orally to this Court. They are therefore addressed in an unpublished appendix to this opinion.
[4] The statute, amended by Acts 1995, No. 434, § 1, now provides:

A court shall not receive an unqualified plea of guilty in a capital case. However, with the consent of the court and the state, a defendant may plead guilty with the stipulation either that the court shall impose a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence without conducting a sentencing hearing, or that the court shall impanel a jury for the purpose of conducting a hearing to determine the issue of penalty in accordance with the applicable provisions of this Code.
[5] It should also be noted that this Court has held that there is no prejudice in requiring that a plea of not guilty be entered in a capital case and in prohibiting defendant from entering a bifurcated plea, which would establish guilt in the guilt phase but allow him to challenge capital punishment in the penalty phase. State v. Watson, 423 So.2d 1130 (La.1982).
[6] Also contained within this assignment of error is defendant's argument that the failure of the trial court to allow him to plead guilty violated his right to present relevant mitigating circumstances. This issue is considered in the Capital Sentencing Review portion of this opinion.
[7] Dr. Forsyth had worked as an expert without testifying in 40 to 50 capital cases and had previously been qualified as an expert witness in the penalty phases of several capital trials.
[8] Specifically, Dr. Forsyth stated:

We interviewed prison inmates, over a hundred prison inmates, uh, and we asked them about the crime, uh, their history of intoxication, uh, and then the implications that that had for rehabilitation. We also talked about them, the way they use that, uh, the way they use the, uh, intoxication and whether they were trying to use intoxication as a way of getting around, uh, responsibility for their crime.
[9] It should also be noted that defendant claims to have fathered a child from a sexual encounter with his step-aunt at the age of nine years.
[10] According to Dr. Turin's psychological evaluation, "[i]t was not until Dwayne was an adolescent that his mother told him he began to resemble a man with whom she had had a `one night stand.'"
[11] Comeaux was again sentenced to death at the second penalty phase hearing. This appeal is pending before this Court, 93-KA-2729.
[12] Defendant also argues in numerous unbriefed assignments of error a variety of errors (Assignment 45, 47, 48, 49, 50, 54, 55, 56). These assignments are factually and substantively vague. Furthermore, a review of the record does not readily reveal what defendant might be alleging was error. Consequently, these assignments are unreviewable. See State v. Sanders, 93-0001, 648 So.2d 1272 (La.11/30/94), unpub. app. at 2 [1994 WL 673949 at * 19]; cf. La.Code Cr.P.arts. 841, 920.