# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 08-1059

**STATE OF LOUISIANA**

**VERSUS**

**LEE VIDRINE**

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 05-K-4593-C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS
JUDGE**

**********

Court composed of John D. Saunders, Michael G. Sullivan, and James T. Genovese, Judges.

**CONVICTIONS VACATED; REMANDED FOR A NEW TRIAL.**

**Glen D. Vamvoras**
**Vamvoras & Schwartzberg**
**1111 Ryan St.**
**Lake Charles, LA 70601**
**(337) 433-1621**
**Counsel for Defendant/Appellant:**
**Lee Vidrine**

**Michael H. Schwartzberg**
**Vamvoras & Schwartzberg**
**1111 Ryan St.**
**Lake Charles, LA 70601**
**(337) 433-1621**
**Counsel for Defendant/Appellant:**
**Lee Vidrine**

**Daniel James Stanford**
**Attorney at Law**
**117 Caillouet Place**
**Lafayette, LA 70501**
**(337) 232-2272**
**Counsel for Defendant/Appellant:**
**Lee Vidrine**

**Earl B. Taylor**
**District Attorney, 27th J.D.C.**
**Jennifer Ardoin**
**Assistant District Attorney**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1968**
**(337) 948-3041**
**Counsel for Appellee:**
**State of Louisiana**

**SAUNDERS, Judge.**

The Defendant, Lee Dwayne Vidrine, was indicted on two counts of sexual battery of a juvenile under the age of fifteen, in violation of La.R.S. 14:43.1, and five counts of indecent behavior with a juvenile under the age of fifteen, in violation of La.R.S. 14:81. Following a trial by jury, held on March 19-20, 2008, the Defendant was found guilty as charged.

The Defendant was sentenced on June 19, 2008. For each count of sexual battery, the Defendant was ordered to serve concurrent sentences of one year in the parish jail without benefit of parole, probation, or suspension of sentence.

On each count of indecent behavior with a juvenile, the Defendant was sentenced to four years at hard labor, with the sentences suspended. The trial court also ordered all of the sentences to run concurrently with each other and with each count of sexual battery. The Defendant was also sentenced to three years of active supervised probation. General conditions for probation as set forth in La.Code Crim.P. art. 895 were ordered, as well as the following special condition: one year in the parish jail on each count, to run concurrently with work release and with the counts of sexual battery.

The Defendant did not file a motion to reconsider his sentences. He is now before this court on appeal, asserting that the evidence at trial was insufficient to sustain the convictions on counts four through seven. Additionally, the Defendant asserts that the trial court erred in refusing to conduct a hearing, testing the reliability of expert testimony. Lastly, the Defendant alleges that the trial court erred in allowing the expert witness to express opinions regarding the testimony of the victim being consistent with patterns of sexual abuse and that statistically the victim was telling the truth. We find that the evidence was sufficient to support the Defendant's

convictions; however, the remaining two assignments of error have merit. As such, we vacate the Defendant's convictions and remand the case for a new trial.

## FACTS:

Between the months of August and November of 2004, the Defendant participated in various sexual activities involving the teenaged victim, B.M.,[1] his neighbor, including touching of B.M.'s penis; viewing pornography; having sex with his live-in partner and accomplice, Curt Fontenot, in front of B.M; and watching Fontenot perform oral sex on B.M. on six or seven occasions.

## ASSIGNMENT OF ERROR NO. 3:

The Defendant challenges the sufficiency of the evidence in his third assignment of error. Thus, we will proceed with an analysis of whether the entirety of the evidence, both admissible and inadmissable, was sufficient to support the conviction. We do so due to the following:

> When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot.
>
> On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. If the reviewing court determines there has

---

[1] Use of initials is in compliance with La.R.S. 46:1844(W).

2

been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

*State v. Hearold*, 603 So.2d 731, 734 (La.1992)(footnote omitted).

The analysis for a claim of insufficient evidence is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983).

*State v. Freeman,* 01-997, p. 2 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

The Defendant was found guilty of five counts of indecent behavior with a juvenile and two counts of sexual battery on a juvenile under the age of fifteen. Louisiana Revised Statutes 14:81 reads in pertinent part:

A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:

(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense; or

(2) The transmission of an electronic textual communication or an electronic visual communication depicting lewd or lascivious conduct, text, or images to any person reasonably believed to be under the age of seventeen and reasonably believed to be at least two years younger than the offender. It shall not be a defense that the person who actually receives the transmission is not under the age of seventeen.

In *State v. Cloud*, 06-877, p. 9 (La.App. 3 Cir. 12/13/06), 946 So.2d 265, 272, *writ denied*, 07-86 (La. 9/21/07), 964 So.2d 331, this court adopted the definition of a lewd or lascivious act as "'one which tends to excite lust and to deprave the morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner,'" quoting *State v. Rollins*, 581 So.2d 379, 382 (La.App. 4 Cir. 1991). *See also State v. Holstead*, 354 So.2d 493 (La.1977); *State v. Prejean*, 216 La. 1072, 45 So.2d 627 (La.1950).

Sexual battery is defined in La.R.S. 14:43.1, which reads in pertinent part:

A. Sexual battery is the intentional engaging in any of the following acts with another person where the offender acts without the consent of the victim, or where the act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender:

(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or

(2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.

In *State v. Rideaux*, 05-446, p. 2 (La.App. 3 Cir. 11/2/05), 916 So.2d 488, 491, the court observed the following ruling in *State v. Roca*, 03-1076, pp.11-12 (La.App. 5 Cir. 1/13/04), 866 So2d 867, 874, *writ denied*, 04-583 (La. 7/2/04), 877 So.2d 143:

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. *State v. Stec*, 99-633, p. 4 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787. In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.

At trial, the fifteen-year-old victim testified that he was born on August 19, 1991. B.M. testified that in 2004 he lived next door to the Defendant and

co-defendant. He also stated that the Defendant had a pool and that he spent a lot of time at the Defendant's home, especially on weekends and when he got home from school. B.M. testified that he even stayed overnight at the Defendant's house on one or two occasions.

B.M. testified that the first incident occurred at the Defendant's pool. He explained that he and his neighbors often engaged in horseplay, which sometimes involved pulling down someone's pants. B.M. testified that on one particular occasion the Defendant pulled B.M.'s pants completely down, exposing his penis and then touched his penis with his hands. B.M. explained that he did not remember exactly how it happened but stated that this was the first time he was touched by his neighbors. He also stated that he did not take the touching seriously and that he dismissed it as horseplay. B.M. testified that the pool incident only happened once.

Next, B.M. testified about a second occasion where the Defendant stuck his hands down B.M.'s pants while he was lifting weights on a weight bench. B.M. explained that the weight bench was located in the Defendant's garage. When the prosecution asked whether the Defendant touched his penis, B.M. answered in the affirmative. B.M. testified that he was wearing short pants and a muscle shirt on this particular occasion. He also stated that during this particular incident, Fontenot was not present but that he was possibly somewhere in the house.

B.M. also testified about a third incident that occurred one night when he stayed at the Defendant's home while his mother had gone out for the night. B.M. testified that after he arrived at their home, his neighbors put pornography on the TV, which was located in the living room. B.M. explained that he was sitting in the living room on a chair while his neighbors, who were completely naked, were sitting on the

5

sofa.  B.M. testified that he then observed the Defendant having anal sex with Fontenot in the living room.  During this time, the TV was still on.  When the prosecution asked B.M. whether he was wearing his clothes, he responded, "Yes, sir, at the time," and then explained that later on Fontenot came over and removed his clothes.  B.M. testified that Fontenot then performed oral sex on him.  He also stated that Fontenot was naked at the time and that the Defendant was also present.  The prosecution asked B.M. if he had an orgasm in response to the oral sex, and he responded in the affirmative.

The prosecution then questioned B.M. about the last incident that he remembered.  B.M. testified about an incident where he looked at pornography on the Defendant's computer.  The prosecution then tried to pinpoint a time frame in which these crimes occurred, as follows:

> Q.  Over what kind of period, how long from the first panting [referring to the act of pulling down someone's pants], when he panted you, until the last incident which you just said was the computer, was that more than a year or was that just several months?
>
> A.  I think that was a lil [sic] more than a year.
>
> . . . .
>
> Q.  All right.  How old were you when the computer thing happened?
>
> A.  Thirteen (13) or fourteen (14).
>
> Q.  Let me tell you what our parameters are, okay.
>
> A.  Okay.
>
> Q.  We start in June of 2004.  Your dad left in May, right?  That's kind of an  easy thing for you to remember, right?
>
> A.  Right.
>
> Q.  So it happened shortly after, - the first time happened, - the panting started shortly after your dad had left?

6

A.    Yes, Sir.

Q.    And we're gonna go until November which is the end of that year. You turned thirteen (13) in August, is that right?

A.    Yes, sir.

Q.    So we'll go till November.  We don't want to go past that November.  You understand what I'm saying.  So we're talking essentially about a six (6) to seven (7)  month period?

. . . .

Q.    All right.  Now, the computer, the computer incident, did that happen in that six month period or do you know?

A.    I don't know.  It was the last incident.  That's all I can remember.

Q.    That's all you can remember?

A.    Yes, sir.

Q.     I mean, months, or what?

A.    Yes, sir, months.

. . . .

A.    I guess it was before May of 2005.

. . . .

Q.    Could it be in November of 2004?

A.    No, sir.

Q.    Okay.  What's the last thing you remember in 2004?

A.    Um - I guess it would have to be the whenever I went spend the night over there?

B.M. further testified that he received fellatio from Fontenot seven or eight times and that the Defendant was always present.  He stated that the Defendant tried to stop Fontenot a couple of times and told him that it was wrong, but that Fontenot

would do it anyway. B.M. also indicated that on these seven or eight occasions the Defendant and Fontenot were naked most of the time. B.M. testified that he often told them to leave him alone but that it did not really faze them. B.M. further stated that he looked at pornography with the Defendant on the computer once and two or three times on TV. He also stated that they had a couple of pornographic magazines.

In conclusion, the prosecution questioned B.M. as follows:

Q. So it's your testimony that this defendant touched you twice and it's your testimony that you received fellatio - it's the right, appropriate, it comes from Latin, meaning blow jobs, while this defendant was present naked?

A. Yes, sir.

Q. Six (6) or seven (7) times?

A. Yes, sir.

On appeal, the Defendant contends that "[t]he evidence was virtually nonexistent on direct examination as no alleged incidents were testified to have taken place during the requisite time periods." In particular, the Defendant asserts that the State failed to meet its burden of proof with regard to counts four through six, as B.M.'s testimony on direct did not reveal facts relating to a fourth, fifth, or sixth incident. The only testimony relating to either count was given on cross-examination when B.M. was specifically questioned by defense counsel. The Defendant further contends that the incidents B.M. testified to on cross-examination were never reported to the police.

Count four of the indictment charges the Defendant with committing indecent behavior with B.M. on or about the end of August or the beginning of September 2004. On cross-examination, defense counsel asked B.M. to testify about what

8

happened after the third incident in relation to the dates asserted in count four, and B.M. testified to the following:

A. I can't remember.

Q. Okay, what happened the fourth time that's alleged in the indictment?

A. The fourth time, I'm not sure.

Thus, the Defendant argues that B.M.'s testimony is insufficient to prove the elements of count four. While the Defendant acknowledges that B.M. testified to receiving oral sex about six or seven times in the Defendant's presence, he argues that this testimony was "not tied to any count in the indictment and may have been even repetitive of Counts I to III."

Count five of the indictment charges the Defendant with committing indecent behavior with B.M. on or about the latter part of September or the first part of October 2004. When defense counsel asked B.M. to testify about count five, B.M. stated that he and his neighbors looked at pornographic magazines and that Fontenot performed oral sex on him. The Defendant contends that B.M. did not report this "fifth" incident to the police during the initial investigation.

Count six of the indictment charges the Defendant with committing sexual battery upon B.M. on or about the latter part of September or the first part of October 2004. When asked to testify about count six, B.M. told defense counsel that a second "weight bench incident" took place, presumably referring to his prior testimony relating to count two. Defendant notes in brief that B.M. "does not say what happened or how a sexual battery took place." Further, the Defendant contends that this "weight bench episode" was never reported to the police.

9

In addition to challenging the sufficiency of evidence on counts four through six, the Defendant attacks B.M.'s credibility on all counts. The Defendant points out several inconsistencies between B.M.'s testimony and the testimony of the Defendant. At trial, the Defendant testified that his weight bench was not located in their garage, as B.M. indicated on direct examination, but was stored in a shed and was not used by anyone. The Defendant also notes that the investigating officer testified that she did not see a weight bench anywhere in the Defendant's home or garage. According to the Defendant, the officer's testimony also "confirmed that there were in fact no incriminating or pornographic video tapes" found in the Defendant's home. Review of the officer's testimony reveals that the Defendant is correct in this assertion.

Angela Roberts is a juvenile investigator at the St. Landry/Evangeline Sexual Assault Center. According to her testimony, she was called out to investigate this matter on September 16 or 17, 2005. Her report from that investigation indicates that B.M. told her that the abuse began in 2003 and ended in 2005, about a month before he reported it. She testified that B.M. never told her about the incident where the Defendant touched his penis at the pool, nor did he mention anything about the Defendant sticking his hands down his pants or anything else involving a weight bench. She testified that she searched the Defendant's home. When asked about the weight bench in the garage, she stated, "I mean, I'm not saying it wasn't one. I don't remember[,] I don't recall one." She also stated that B.M. told her that there were ten occurrences. She indicated that B.M.'s description of the events was that pornographic videos were put on and then masturbation and oral sex occurred. B.M. also stated that the same thing happened ten times and that after each incident he went home and took a shower. Ms. Roberts searched the entire home of the Defendant and

seized twenty-six video tapes and the Defendant's computer. She stated that no other computer was found in the home. Her testimony also revealed that the computer was ordered by the Defendant on August 11, 2005. Ms. Roberts testified that, based on her investigation, the video tapes contained no pornographic material.

Next, the Defendant challenges B.M.'s memory and inability to recall details and argues that B.M. was unsure about when he viewed pornography on the Defendant's computer. As previously stated, B.M. testified that this was the last incident of abuse. When the victim initially gave his statement to the police in September 2005, he reported that the last incident occurred about a month prior. Thus, this allegation regarding when the last incident occurred is supported by the record, as the Defendant's computer was purchased on August 11, 2005.

We also note the testimony of Roy Mallet, the officer who investigated the content on the Defendant's computer. According to his testimony, the Defendant's computer contained an internet history with a list of sites he claimed suggested homosexual pornography. He could not, however, remember the names of the sites or state how they suggested pornography. He also testified that he did not write a report documenting these sites.

In response to the Defendant's attack on the victim's credibility, the State contends that B.M.'s failure to report each incident does not mean that those acts did not occur. The State argues that B.M. admitted that he did not state everything that happened to him in his report to the police. He explained that he "thought Ms. Roberts [the detective] was looking for one incident. I didn't know she wanted all of them."

11

The State further contends that "dates are not essential to the crimes of indecent behavior with a juvenile and sexual battery; therefore, the fact that the time frames were not specifically satisfied by B.M.'s testimony is not an essential issue." La.Code Crim.P. art. 468. As the State has pointed out in its brief, La.Code Crim.P. art. 468 provides in pertinent part:

> The date or time of the commission of the offense need not be alleged in the indictment, unless the date or time is essential to the offense.

> If the date or time is not essential to the offense, an indictment shall not be held insufficient if it does not state the proper date or time, or if it states the offense to have been committed on a day subsequent to the finding of the indictment, or on an impossible day.

Further, it is well settled in Louisiana jurisprudence that the State is not required to present evidence proving the date of the offense when it is not an essential element of the crime. *State v. Yossett*, 41,926 (La.App. 2 Cir. 4/25/07), 956 So.2d 109, *writ denied*, 07-1110 (La. 11/21/07), 967 So.2d 1155.

We note that any inconsistent statements made by B.M. were also explained by the testimony of the State's expert witness, Ms. Judy Benitez. Although the Defendant challenges the admissibility of Ms. Benitez's testimony in his second assignment of error, under *Hearold*, 603 So.2d 731, we are required to consider the entirety of the evidence in the sufficiency review. Thus, we will present a brief description of the expert testimony given by Ms. Benitez.

Immediately following B.M.'s testimony, and over defense counsel's objection, Ms. Benitez was accepted as an expert in "the field of social work with a specialty in the dynamics of victimization." She testified about the general characteristics of sexual abuse victims and explained that delayed disclosures and inconsistent statements are common among child victims. She also testified about the statistical

probability of false reporting with respect to rape cases and stated that B.M.'s testimony in this case did not have the characteristics of false allegations. Ms. Benitez explained to the jury that B.M.'s testimony about the Defendant pulling down his pants and touching his penis was an example of a behavioral characteristic of sex offenders called "grooming," which is a term used to describe the initial stages of abuse where the offender tests the boundaries of his victim. When questioned on cross-examination about B.M.'s inconsistent statements, Ms. Benitez explained that B.M. described several incidents of abuse that happened in the same manner and stated that "he may have just mixed up a couple of incidents in his mind." She also explained that B.M. may not have understood whether the officer was asking about the first incident or the last incident of abuse. Thus, if admissible, we find that Ms. Benitez's testimony vouched for B.M.'s credibility.

In summation, the Defendant was convicted of five counts of indecent behavior with a juvenile and two counts of sexual battery of a juvenile under the age of fifteen. At trial, B.M. testified that the Defendant touched his penis on three separate occasions. B.M. testified that he received oral sex from Fontenot about six or seven times and that the Defendant was always present and usually naked. B.M. also testified about viewing pornographic magazines and indicated that the last incident of abuse involved viewing pornography with the Defendant on his computer.

When B.M. initially reported these events to the police, his description involved pornography, masturbation, and oral sex and indicated that this pattern of abuse occurred about ten times. His report to the police did not include any incident where the Defendant touched him on his penis or mention of any facts relating to his neighbors having sexual intercourse in his presence. He reported that his neighbors

13

played pornographic videos; however, no such videos were found in the Defendant's home. The State's expert witness, Ms. Benitez, explained that inconsistent statements are common among sexually abused children. She testified to the statistical probability of false reporting and stated that B.M.'s testimony did not show signs of being a false report. Ms. Benitez also explained how the Defendant's behavior fit the pattern of sexual offenders.

With respect to the Defendant's argument that B.M. failed to mention several of these events in his initial report to the police, we find that this is an attack on the victim's credibility, which is outside the purview of this court. The State, in its very well-written brief, argues that the victim admitted that he did not state everything that happened to him in his report to the police. He explained that he "thought Ms. Roberts [the detective] was looking for one incident. I didn't know she wanted all of them."

Credibility determinations are reserved for the fact-finder. The jury heard the testimony of the victim and the Defendant at trial and, apparently, found the victim more credible. After reviewing the entirety of the evidence, both admissible and inadmissible, we find that it supports the Defendant's convictions on all counts of sexual battery and indecent behavior with a juvenile. As such, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 1:**

The Defendant's first assignment of error is that "the trial court erred as a matter of law in refusing to conduct a hearing testing the reliability of the expert opinions and testimony of Ms. Judy Benitez prior to her testimony at trial." Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 516 U.S. 869, 116 S.Ct. 189 (1995),

the Defendant asserts that he has a right to an evidentiary hearing. He further contends that because he specifically and timely moved for a *Daubert* hearing at trial, his motion was wrongfully denied.

The State argues that a pre-trial hearing was held to determine the qualifications of the expert witnesses, and, thus, the Defendant had ample opportunity to question Ms. Benitez about the reliability of her opinions. The State further contends that the *Daubert* standards are "not applicable in all cases or with all experts" and that the trial court has broad discretion in how it determines expert reliability, citing *State v. Brannon*, 07-431 (La.App. 3 Cir. 12/5/07), 971 So.2d 511, *writ denied*, 07-2465 (La. 5/9/08), 980 So.2d 689; *State v. Esteen*, 02-1241 (La.App. 5 Cir. 4/29/03), 846 So.2d 167, *writ denied*, 03-1486 (La. 1/9/04), 862 So.2d 978, as examples of the trial court's broad discretion regarding the use of *Daubert* hearings to determine the qualifications of expert witnesses.

Toward the end of the State's case-in-chief and prior to Ms. Benitez's testimony, the Defendant requested the trial court to conduct a *Daubert* hearing. The relevant discussion is as follows:

> MR. STANFORD: Can I just note for the record that I request a *Daubert* hearing on the State's expert to determine whether or not the State's experts uh- have scientific – whether the test that's [sic] she's using to determine whatever she's gonna determine is based on scientific fact and whether or not it's been proven in any cases in which she's relying on. We make that request for a *Daubert* hearing to determine it.
>
> MR. RICHARD: I think she's already been qualified as an expert, Judge. I think – this is not like a piece of equipment. This is gonna be testimony based on her experience so –
>
> THE COURT: Yeah, the motion is denied. I've already accepted the witness as an expert before we started trial.
>
> . . . .

15

MR. STANFORD:   We just lodge an objection to that, Judge.

When denying the Defendant's motion, the trial court referred to a hearing that was held earlier that day before the commencement of trial. In particular, the hearing was held in response to the State's request to have expert witnesses excluded from the rule of sequestration. When the Defendant objected on the grounds that the witnesses had not been qualified as experts, the trial court held a hearing, outside the presence of the jury, to consider the qualifications of each witness.

At that hearing, Ms. Benitez attested to her qualifications as an expert in the "dynamics of victimization." Ms. Benitez has a Masters Degree in Counseling and has served as the Executive Director of the Louisiana Foundation Against Sexual Assault (LFASA) for the past fourteen years. She has worked with sexual assault victims for the past seventeen years and has counseled between four and five hundred victims and their family members. She has qualified twice before as an expert in the dynamics of victimization in sexual assault and domestic violence. She has given over two-hundred professional presentations in twenty-six different states to others involved in this line of work.

According to Ms. Benitez's testimony on cross-examination, she had never met or interviewed B.M. She only reviewed the documents included in the District Attorney's case file, which included statements from B.M., his mother, his aunt, his school principal, and the indictment. She did not review any school or counseling records. When asked about the previous cases where she testified as an expert, Ms. Benitez testified that she did not interview the victim in those cases either. She explained:

16

I reviewed the witness [sic] statements. The same as in this case. And it was um – what I spoke to was not the act – the case that was in question but in terms of does it fit with what often happens in these types of cases.

Defense counsel attempted to question Ms. Benitez regarding her proposed testimony at trial, but he was interrupted each time by the State's objection. Their exchange is as follows:

Q. Okay. And so you're [sic] testimony or your opinion in this case would be –

MR. RICHARD: I'm gonna object. Let me object. He's asking for her opinion. At this point it's not about her opinion. This goes for expertise. I object to any questioning that goes to her opinion at this point in time. We're just here to decide –

MR. STANFORD: Okay. I'll withdraw it.

MR. STANFORD CONTINUES:

Q. Your testimony then would be to generalize traits of what victims encounter in these types of cases?

MR. RICHARD: Again, that's asking her what she's gonna testify to. It's not going to whether or not she's and [sic] expert.

MR. STANFORD: I'm trying to find out what she would be qualified as.

MR. RICHARD: No. She's being qualified as an expert. She doesn't know what questions I'm gonna ask. I haven't told Ms. Benitez what I'm gonna ask her.

THE COURT: Sustained.

MR. STANFORD CONTINUES:

Q. So Ms. Benitez, when you were qualified as an expert before, you were allowed to answer any questions that the District Attorney asked you regarding what may or may not have happened in that particular case and how it affected the victim?

17

A.    No. In those cases it had to do with whether how the victim reacted, specific actions that were taken by the victim were typical of a sexual assault victim or not.

Q.    Um-huh.  And you were allowed to qualify as an expert without ever having talked to the victim?

A.    Yes.

After questioning Ms. Benitez, defense counsel then objected to her being permitted to testify as an expert witness, contending that: 1) she had not talked to any of the witnesses or B.M.; 2) her testimony would consist of generalized opinions about how victims react; 3) he was not provided with her curriculum vitae prior to trial with an opportunity to traverse it, nor was he given notice prior to the day of trial that an expert would be called; and 4) her testimony would not be relevant, since she had only reviewed the witnesses' statements contained in the case file.

In response, the State asserted that the nature of her testimony would be based on "hypothets [sic] in line with the testimony that's elicited." After recognizing Ms. Benitez's education, training, and experience, the trial court accepted her as an expert in "sexual assault and victim abuse."

**Whether the trial court erred in its refusal to conduct a *Daubert* hearing at trial:**

On appeal, the Defendant contends that the trial court "mistakenly" relied on the pre-trial hearing when it denied his motion for a *Daubert* hearing.  The Defendant asserts that the pre-trial hearing had "nothing to do with the defense's right to test the scientific and/or factual basis and reliability of the expert's opinion(s)." He further contends that the pre-trial hearing did not fall within the standards of a *Daubert* inquiry because the trial court "refused to allow defense counsel to ask questions about Ms. Benitez's opinion."

18

In *State v. Foret*, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *State v. Chauvin*, 02-1188 (La.5/20/03), 846 So.2d 697. To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 592-594, 113 S.Ct. 2786. In *Foret, supra*, the court adopted these observations as a helpful guide for our lower courts in considering this difficult issue. *Id.* Thus, Louisiana has adopted *Daubert's* requirement that in order for technical or scientific expert testimony to be admissible under La. C.E. Art. 702, the scientific evidence must rise to a threshold level of reliability. *Daubert's* general "gatekeeping" applies not only to testimony based upon scientific knowledge, but also to testimony based on "technical" and "other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); *Independent Fire Ins. Co. v. Sunbeam Corp.*, 99-2181 (La.2/29/00), 755 So.2d 226. The trial court may consider one or more of the four *Daubert* factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. *Id.* Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determinations. *Kumho, supra* at 526 U.S. 142, 119 S.Ct. 1167, 143 L.Ed.2d 238.

*State v. Allen*, 41,548, pp. 11-13 (La.App. 2 Cir. 11/15/06), 942 So.2d 1244, 1254-55, *writ denied*, *State ex rel. Allen v. State*, 07-530 (La. 12/7/07), 969 So.2d 619.

*Brannon,* 971 So.2d at 517-18.

The purpose of a *Daubert* hearing is to determine the reliability of an expert's methodology, not whether the expert has the proper qualifications to testify. *Cheairs v. State ex rel. Dep't of Transp. & Dev.*, 03-680 (La. 12/3/03), 861 So.2d 536. The pre-trial hearing that was held in this case was for the purpose of determining Ms. Benitez's qualifications as an expert. Both the State and the Defendant questioned Ms. Benitez about her background, training, and professional experience. She even discussed the nature of her testimony as an expert in previous cases involving victims of sexual abuse. However, she did not state what methodology or reasoning she applied to make that determination. When defense counsel attempted to question her more specifically about the nature of her testimony in this case, he was limited to discussing only her qualifications as an expert as a result of the sustainment of the State's objection. Consequently, this pre-trial hearing did not reach the level of a *Daubert* inquiry, as it did not address the reliability of Ms. Benitez's testimony nor did it address the methodology upon which she would base her opinion.

We find that the trial court should have made this inquiry and allowed Ms. Benitez's testimony for the limited purposes of explaining any delays in reporting, recantations, and omissions of details. *See State v. Chauvin*, 02-1188 (La. 5/20/03), 846 So.2d 697 and *Foret*, 628 So.2d 1116. Because the trial court never made any determination regarding the admissibility of Ms. Benitez's testimony and then denied the Defendant a *Daubert* hearing, the State was permitted to present the expert's testimony which exceeded the above-described limitations. Thus, under *Daubert* and *Foret*, the trial court failed to perform its "gatekeeping function." As such, under the circumstances of this case, we find that the trial court's denial of the Defendant's request for a *Daubert* hearing was an abuse of its discretion.

20

**ASSIGNMENT OF ERROR NO. 2:**

Defendant's second assignment of error is that the trial court committed reversible error, as its failure to hold a *Daubert* hearing resulted in damaging testimony that affected the substantial rights of the accused. In support of this contention, the Defendant contends that Ms. Benitez made impermissible statements when she testified that the testimony of B.M. was consistent with patterns of sexual abuse and that, statistically, B.M. was telling the truth.

First, the Defendant argues that Ms. Benitez's testimony was unreliable under La.Code Evid. art. 702. The Defendant also complains that no proper foundation was offered for Ms. Benitez's opinions, as her testimony was based solely on her experiences and observations with victims of sexual abuse. Louisiana Code of Evidence Article 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. As such, the State contends that once Ms. Benitez was accepted as an expert witness, her opinion testimony was admissible under the Louisiana Code of Evidence. In his reply brief, the Defendant contends that "the law does not provide for the admissibility of expert opinions merely because the expert 'says it is so.'"

Next, the Defendant contends that Ms. Benitez's testimony lacks any reasonably-based foundation, as she did not interview B.M. or the witnesses prior to hearing their testimony at trial. The State contends that under La.Code Evid. art. 703, an expert can base his/her opinion on facts or data which are perceived or made known to him at or before the hearing. In his reply brief, the Defendant contends that

"[s]ince the trial court did not allow a *Daubert* hearing, we do not have Ms. Benitez's testimony as to whether it is normal to give opinions without any testing, interviews or preparatory work whatsoever, a proposition that should give the courts considerable pause with regard to its impact on the integrity of the courts." The Defendant also asserts that "[i]n reference to the concert of Article 703, the comments written in 1988 make it clear that the article speaks to an expert being able to answer hypothetical questions based upon testimony elicited at trial." The Defendant further asserts that there is "absolutely no testimony or foundation to support Ms. Benitez's opinion as passing muster under the second sentence of Article 703," which states that if the facts or data is the type that is "reasonably relied upon by experts in a particular field in forming opinion or inferences on the subject, the facts or data need not be admissible in evidence."

In this case, Ms. Benitez testified as to the general characteristics of sexual abuse victims, such as delayed disclosures and inconsistent statements. In *Wimberly v. Gatch*, 93-2361 (La. 4/11/94), 635 So.2d 206, our supreme court stated similar expert testimony "should be admissible for the limited purpose of explaining, in general terms, certain reactions of a child to sexual abuse like delayed reporting and recantation, when the child victim/witness' credibility is attacked." *Id.* at 215.

In *State v. Torregano*, 03-1335, pp. 6-7 (La.App. 5 Cir. 5/11/04), 875 So.2d 842, 847, the court stated:

> The trial court is vested with wide discretion in determining the competence of an expert witness and its ruling on the qualification of the witness will not be disturbed absent an abuse of discretion. *State v. Craig*, 95-2499, p. 9 (La.5/20/97), 699 So.2d 865, 870, *cert. denied*, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). *See also*, *State v. Qutoum,* 02-780, p. 7 (La.App. 5th Cir.1/28/03), 839 So.2d 323, 327, *writ denied*, 03-595 (La.5/30/03), 845 So.2d 1059, citing *State v. Craig.* In reviewing the decision of the trial court to qualify a witness as an

expert, the appellate courts will also consider whether a witness has previously been qualified as an expert. *Craig*, 95-2499 at 9, 699 So.2d at 870.

Thus, we find that based on Ms. Benitez's training, background, and experience, as well as her prior testimony as an expert witness, the trial court did not abuse its discretion in finding her qualified as an expert at trial. Furthermore, under *Chauvin* and other Louisiana jurisprudence, Ms. Benitez's testimony would generally be found admissible.

Additionally, despite a lengthy cross-examination, the Defendant did not raise these specific objections at trial. Thus, under the contemporaneous objection rule, this court finds that these issues were not properly preserved for appellate review. *State v. Potter*, 591 So.2d 1166 (La.1991); La.Code Crim.P. art. 841.

Lastly, the Defendant contends that Ms. Benitez's testimony bolstered the victim's credibility. In this argument, the Defendant challenges Ms. Benetiz's testimony regarding B.M.'s characteristics being consistent with sexual abuse victims and that B.M. was statistically telling the truth. The State contends that "Ms. Benitez testified in general to the statistics of false reporting" and to the patterns of sexual abuse victims. In *State v. Foret*, 628 So.2d 1116 (La.1993), our supreme court addressed the issue of whether similar expert testimony could be used to bolster the credibility of sex abuse victims. The court found it improper for the expert to testify that he felt the witness was telling the truth regarding the occurrence of sexual abuse. The court stated, "[t]his expert assessment of the witness' credibility was improper . . . ." *Id.* at 1130. However, the court found the expert testimony would be proper as "long as the expert limits the testimony to general characteristics that would explain delays in reporting, recantations, and omission of details . . . ." *Id.* The court

23

explained that such testimony will not "substitute [the expert's] estimation of credibility for that of the jury. Rather, it is to provide a scientific perspective for the jury according to which it can evaluate the complainant's testimony for itself." *Id.* (quoting Goldstein, *Credibility and Incredibility: The Psychiatric Examination of the Complaining Witness*, 137 Am.J.Psychia. 1238, 1240 (1980)).

In the present case, Ms. Benitez testified as to the general characteristics of delayed reporting and inconsistencies in the testimony of child sexual abuse victims, and, to that extent, her testimony was admissible under *Foret.* However, she also testified to the statistical probability of false reporting. The following exchange occurred between Ms. Benitez and the prosecutor:

> Q.     You and I talked, Ms. Benitez, about the statistical probability of a false report. And you gave me some statistics from the FBI; is that correct?
>
> A.     That's correct.
>
> Q.     Would you tell the Jury what the statistical - what the FBI finds as the percentages of false reports in all of these reports of sexual abuse?
>
>> MR. STANFORD:       I'm gonna object to that, Judge, because I don't have any data to look at, to refute. She can get up there and say whatever she wants to say, and that's part of this little charade that Mr. Richard - puts her up on a stand and she's gonna say or go along with whatever he wants her to say.
>>
>> THE COURT:     Well, I qualified her as an expert and you know the rules on the expert. That's overruled.
>>
>> MR. STANFORD:       I don't think that's part of the rules, Judge, that she can just make up information without any supporting documentation.
>>
>> THE COURT:     The objection is overruled.
>
> MR. RICHARD CONTINUES:
>
> Q.     You're making this up, Ms. Benitez?

A.	I'm actually not, no.  According to the FBI when they're asked, and the reason that the FBI is relevant is that they gather statistics from local law enforcement in the Uniform Crime Report and they release reports periodically.

	. . . .

A.	And there is always a lot of question around false allegations of sexual assault because it generally is not something that is done in front of witnesses. So it is usually, you know, that the victim says something happened and the offender says that it doesn't, that it didn't.  Or they may say, "well, it did, but it wasn't me".  The FBI says that false allegations of rape or [sic] about the same as false allegations of any other class of violent crime which they estimate to be between two and five percent.

Q.	So ninety-five to ninety-eight percent of the allegations of sexual abuse are found by the FBI to be valid.  You're not talking about this case, we're just talking about statistics?

A.	Right. That's what the FBI says.

Also on direct examination, Ms. Benitez explained that "grooming" is a term

used to describe the initial stages of abuse when the offender is "testing the waters"

or trying to gain the trust of the victim. She then related the victim's testimony about

the Defendant pulling his pants down and touching his penis as an example of

"grooming" behavior.   The prosecutor then questioned Ms. Benitez, as follows:

Q.	So not only does the victim's . . . behavior fit a pattern, but what he reports as being the pattern of behavior of the offenders, it also fits the pattern, doesn't it?

A.	Yes.

Q.	Is there anything that you can tell us that doesn't fit that you heard?

A.	No, I really can't think of anything that doesn't fit.  Um - single mothers are also in particular - sort of a specially venerable [sic] population because of the fact that, you know, they're harried, they're trying to work and made [sic] ends meet. You know, whether - whatever the situation is with the father, the fact that the father is not there on a day-to-day basis make - in particular little boys, you know, there's a

25

vacuum there for positive attention from a male authority figure. So that's also something that fits a pattern.

Q. Is there anything in the literature that shows or explains the two to five percent false reporting? Is there anything that you saw in here that would be a warning flag or tell us, well, no, that might be one of the ones that might come up in the two to five percent of false reports?

A. No. There was nothing that really - there's a few hallmarks of false allegations and there's not a lot of research on this but there's been a little bit, but there wasn't anything like that here.

On cross-examination, Ms. Benitez was questioned as to why her testimony regarding the percentage of false reporting only related to incidents of rape. Ms. Benitez explained that the FBI has their own definition of rape and does not track other kinds of sexual abuse. When defense counsel asked how the statistic applied to the crime in this particular case, she replied, "it's not an exact fit but it's - I think it's as close a parallel as we're able to get. To my knowledge . . . there's been no study on how many cases of childhood sexual abuse were proven to be false." Ms. Benitez was then asked to explain how the FBI statistic could be a "close fit" since there have been no other studies. She responded by stating, "I believe that folks who are in support groups and people who have had similar experiences comparing rape with childhood sexual abuse . . . the dynamics are very much the same." She then stated that this opinion was based on her experience, education, and training. Defense counsel then asked Ms. Benitez if victims lie. She replied, "Yes. Do they lie about having been sexually assaulted. . . . I don't believe that very many do."

Also on cross-examination, Ms. Benitez testified that it is very common for children to remember additional details after giving their initial report. Defense counsel then questioned Ms. Benitez about B.M.'s inconsistent statements, and she replied, as follows:

26

I also think though that it sounded like there were several incidences that were quite similar in terms of what happened, how it started, what kind of porn was involved, and that he may have just mixed them up or he may not have understood when you say the first time or was it the last time, I mean, you know. I –well, I'm not gonna make an analogy, but – I think he may have just mixed up a couple of incidents in his mind.

We find that Ms. Benitez's statements went beyond merely providing a scientific perspective from which the jury could evaluate B.M.'s testimony and spoke directly to B.M.'s credibility and to the specific facts of this case. In particular, her testimony regarding the statistical probability of false reporting of rape cases was irrelevant to the charges at hand and was clearly offered for the sole purpose of bolstering the credibility of B.M. Her opinion regarding the conduct of the Defendant, which she classified as "grooming," was unduly prejudicial because it suggested Defendant's conduct fit the pattern of a sexual offender. We further find that Ms. Benitez's testimony on cross-examination conveyed to the jury that she believed the B.M.'s testimony. *See Hearold*, 603 So.2d 731.

Accordingly, under *Foret*, Ms. Benitez's statements were inadmissable as her testimony impermissibly bolstered B.M.'s testimony and, in all probability, made it more believable to the jury. Moreover, we find that the admission of the expert's testimony affected substantial rights of the accused. For these reasons, we find that the erroneous admission of the expert's testimony was not harmless error. The Defendant's convictions are reversed, and the matter isremanded for a new trial.

We further note that, in its brief, the Defendant sets forth two additional grounds to challenge the reliability of Ms. Benitez's testimony. First, the Defendant points out that at the pre-trial hearing, the trial court accepted Ms. Benitez as an expert in "sexual assault and victim abuse." However, at trial, Ms. Benitez was

qualified as an expert in "social work with a specialty in the dynamics of victimization." Second, the Defendant contends that there is no evidence in the record indicating that Ms. Benitez's explanation of victimization is supported by scientific data or related to a recognized field of study. Although the Defendant objected to Ms. Benitez being accepted as an expert witness, we find that his failure to specifically state these grounds to the trial court precludes him from raising them on appeal. *Potter*, 591 So.2d 1166; La.Code Crim.P. art. 841.

**CONCLUSION:**

We find that the trial court's denial of the Defendant's request for a *Daubert* hearing was an abuse of discretion. Further, we find that certain portions of the State's expert's testimony impermissibly bolstered B.M.'s testimony/credibility. Accordingly, the Defendant's convictions are vacated, and the matter is remanded for a new trial.

**CONVICTIONS VACATED; REMANDED FOR A NEW TRIAL.**